AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>**Three Apple iPhones Seized From The Room<br>of Ryan Evans on March 25, 2019** | )<br>)<br>)<br>)<br>) |

Case No.  19- 132-M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein

located in the _____ District of _____ Delaware _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a), (b)(1)(C); | Delivery or Possession with Intent to Deliver a Controlled Substance |
| 21 U.S.C. 846; and | Conspiracy and Aiding & Abetting |
| 21 U.S.C. 856 | Maintaining a Drug Premises |

The application is based on these facts:

See Attached Affidavit, incorporated herein

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

James Reisch, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date:     04/26/2019

_____
*Judge's signature*

City and state:  Wilmington, Delaware

Hon. Mary Pat Thynge, Chief U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE SEARCHES OF:

Three Apple iPhones Seized From The Room
of Ryan Evans on March 25, 2019

CURRENTLY LOCATED AT:

Case No. _____

DEA Wilmington Resident Office
23 Southgate Boulevard
New Castle, Delaware 19720

## <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE</u>

Your affiant, James H. Reisch, being first duly sworn, hereby deposes and states as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.       Your affiant makes this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – an electronic device – which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.       Your affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since May of 2015. I am currently assigned to the Wilmington, Delaware Field Office within the Baltimore Field Division. I am a graduate of the Federal Law Enforcement Training Center's Basic Criminal Investigator Program and the ATF's Special Agent Basic Training Program.

3.       Prior to your Affiant's employment with ATF, your Affiant was a sworn law enforcement officer with the Virginia Department of State Police for ten (10) years. Your affiant

spent four (4) years assigned to the Bureau of Criminal Investigation, General Investigation Section, Violent Crime Unit. This assignment, as well as your Affiant's previous six (6) years as a uniformed Virginia State Police Trooper, afforded your Affiant the opportunity to investigate and/or arrest and prosecute hundreds of individuals, for violent crimes, white collar crimes, cyber, threats of death or bodily harm against persons, and numerous other criminal offenses in violation of the Code of Virginia and the United States Code.

4.      Your Affiant has attended train programs related investigating cases related to homicide, child abduction, child death investigation, serial killers, criminal profiling, statement analysis, interview and interrogation, hostage negotiation and crime scene forensics. Your affiant attended these schools through courses offered by The Virginia State Police, The Virginia Department of Forensic Science, The Virginia Department of Corrections, The Federal Bureau of Investigation, The Delaware State Police Homicide Unit and The International Association of Homicide Investigators; of which your Affiant is a member.

5.      Your Affiant has been called to testify in United States District Court, multiple jurisdictions across the Commonwealth of Virginia and the State of Delaware involving the aforementioned violations of law. Your Affiant has participated in the preparation and execution of numerous arrest and search warrants for criminal offenses involving violations of the criminal code of Virginia, as well as United States Code.

6.      Your Affiant is a forensic crime scene technician and a graduate of the 85th Session of the Virginia Department of Forensic Science Academy, a Crisis Negotiator and Police Shooting Investigator.

7.      Your affiant has extensive experience in drug and firearms investigations. Your affiant has interviewed over 200 drug users and approximately 100 drug dealers in my career. I

2

have worked on two wiretap investigations, including the instant investigation. I have participated in over 200 controlled purchases of drugs, predominately cocaine, crack cocaine, and heroin. I have also listened to over 500 conversations about drugs. Thus, I am familiar with the coded/cryptic way in which drug dealers and drug users talk about drugs.

## BACKGROUND OF THE INVESTIGATION

8.     Your affiant seeks authority to search the cellular telephones seized from the bedroom of Ryan EVANS, a/k/a "Roscoe" (hereinafter "ROSCOE"), at the time of his arrest following the execution of a federal search warrant at his residence on March 25, 2019. On April 24, 2019, ROSCOE was indicted by a federal grand jury in the District of Delaware for a violation of Title 21 U.S.C. §841(a)(1) & (b)(1)(D)—possession with intent to distribute marijuana.

9.     This indictment was a part of a larger investigation. Between August 2018 and March 2019, the Drug Enforcement Administration ("DEA") initiated an investigation into Alfred EVANS ("EVANS"). Alfred Evans is ROSCOE's brother. Your affiant and other members of the ATF assisted the investigation. During this time period, a confidential source was used to make at least six (6) controlled purchases of crack cocaine or powder cocaine directly from EVANS.

10.     On February 19, 2019, the Honorable Colm F. Connolly, United States District Court Judge for the District of Delaware, issued an Order authorizing the interception of wire and electronic communications over the cellular phone bearing the number (302) 333-6368, serviced by AT&T and used by Alfred EVANS (hereinafter "EVANS"). Interception of communications began on February 25, 2019.

3

11.     Though ROSCOE is currently indicted for a marijuana offense, the investigation in this matter related to a number of different controlled substances.     During the TIII investigation, law enforcement intercepted four hundred and seventy (470) separate telephone calls, labelled as pertinent, containing conversations relating to the manufacture and distribution of cocaine base, cocaine HCL and heroin.

12.     Almost daily surveillance was conducted on EVANS during the TIII.   On at least a half dozen occasions, surveillance officers saw ROSCOE and EVANS together.   Likewise, on at least a half dozen occasions, surveillance officers saw EVANS freely enter ROSCOE's residence, 1300 Linden Street, Wilmington, Delaware, seemingly without anyone letting him in the residence.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

13.     The devices to be searched are:

a.   an Apple iPhone 6S (hereinafter "TARGET DEVICE # 1") with a black front and silver backing with an IC#579C-E2944A and an FCC ID BCGE2944A;

b.   an Apple iPhone X with a white front and rose gold backing (hereinafter "TARGET DEVICE # 2"); and

c.   an APPLE IPHONE 6 with a black screen and a silver backing with IMEI#352014077823024 (hereinafter "TARGET DEVICE # 3").

The TARGET DEVICES are all currently located at the DEA Wilmington Regional Office, in New Castle, Delaware.   The TARGET DEVICES were seized during a search warrant on March 25, 2019; all were found in ROSCOE's room.

4

14.     The applied-for warrant would authorize the forensic examination of the TARGET DEVICES to identify electronically stored data particularly described in Attachment B, incorporated herein.

15.     Your affiant contends based on the allegations herein, and further facts, set forth in this Affidavit, that there is probable cause to believe that the TARGET DEVICES contains evidence of violations of one (1) or more of the SPECIFIED FEDERAL OFFENSES.

## SPECIFIED FEDERAL OFFENSES

16.     This investigation concerns alleged violations of the following:

a.   21 U.S.C. § 841(a)(1), which prohibits any person from knowingly or intentionally manufacturing, distributing, or dispensing, or possessing with the intent to manufacture, distribute, or dispense, a controlled substance.  The substances involved in this investigation include marijuana, crack cocaine, cocaine, and heroin.

b.   21 U.S.C. § 846, which prohibits any person from attempting or conspiring to commit violations of Title 21 of the United States Code.

c.   21 U.S.C. § 846, which prohibits any person from aiding or abetting others who commit violations of Title 21 of the United States Code; and

d.   21 U.S.C. § 856, which prohibits any person from maintaining a dwelling for the purposes of storing controlled substances.

## TECHNICAL TERMS

17.     Based on my training and experience, your affiant uses the following technical terms to convey the following meanings:

a.   Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio

5

signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include

6

various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

    d.   GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e.   PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can

work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

        f.   Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

        g.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static – that is, long-term – IP addresses, while other computers have dynamic – that is, frequently changed – IP addresses.

        h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

        18.    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at

8

https://www.apple.com/iphone-6s/specs/, your affiant knows that the TARGET DEVICES have capabilities that allow them to each serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. Your affiant also knows that iPhones and Android devices function is much the same was a tablets and have many if not all of the same capabilities. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19.     Based on my knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the device because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

9

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

22. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

10

## FACTS ESTABLISHING PROBABLE CAUSE

### i.    Evidence of narcotics trafficking found during search warrant

23.    On March 22, 2019, the Honorable Christopher J. Burke, United States Magistrate Judge for the District of Delaware, issued a Search and Seizure Warrant for 1300 Linden Street, Wilmington, Delaware 19805.

24.    On March 25, 2019, members of the Wilmington Police Department SWAT team along with members of the DEA executed the aforementioned search warrant at 1300 Linden Street. Present at the residence during the execution of the search warrant were ROSCOE, Indee WARD (hereinafter "WARD"), Ryan EVANS Jr., and Kaadir HUNT. WARD is a female acquaintance of ROSCOE. She did not claim any property inside of the residence as her own and was released from custody after the residence was secured.

25.    During the search of the bedroom where ROSCOE was detained, the following items were recovered. This bedroom was described as being in the left rear of the residence directly across from top of the staircase.

a.    One (1) blue New Castle County Superior Court subpoena addressed to ROSCOE at 1300 Linden Street.

b.    Three (3) bundles of United States Currency in the bottom dresser drawer totaling approximately $17,000. Additionally, two (2) smaller sums of USC were located in two (2) separate pairs of men's pants that were located on the floor of the bedroom. Agents confirmed these to be one (1) pair of pants to be grey "H&M" 34 inch waist men's denim pants and the other pair of pants to be navy blue "Nike" size L men's sweat pants.

11

c. TARGET DEVICE # 1 and TARGET DEVICE # 2 were collected from the nightstand next to the bed.

d. TARGET DEVICE # 3 was collected from the television stand within the bedroom.

e. Four hundred twenty six point three (426.3) gross grams of green marijuana[1] packaged within clear glassine sandwich bags and clear plastic containers were collected from inside of a gray backpack.

f. A silver digital scale was located on top of the nightstand next to the bed.

g. A clear plastic bag containing several small empty pink plastic containers and a silver razor blade with white residue on were located in the bottom drawer of the nightstand.

h. A clear glassine sandwich bag containing several small pink plastic containers with cocaine base[2] were collected from inside a wooden watch box positioned on top of the dresser in the bedroom. The cocaine base weighed approximately 37.8 gross grams.

i. A set of keys were found on top of the nightstand within the bedroom. The keys were for a black 2008 Dodge Challenger bearing Delaware registration 961299, which was parked along Linden Street in front of the residence. ROSCOE confirmed that the vehicle was in fact his and is registered to him.

---

[1] Your affiant was informed by Agents processing the residence that a presumptive test was conducted on the seized sample, which registered positive for marijuana.

[2] Your affiant was informed by Agents processing the residence that a presumptive test was conducted on the seized item, which registered positive for crack/cocaine.

26.     During the search of the kitchen of the residence the following items were recovered:

a.     A black digital scale and two (2) clear glassine sandwich bags containing cocaine base and cocaine HCL[3] were located on top of the cabinets above the refrigerator in the kitchen. The cocaine base weighed approximately 45.8 gross grams and the cocaine HCL weighed approximately 55.6 gross grams.

b.     A copy of a handwritten letter by Miriam EVANS, ROSCOE's mother, about ROSCOE'S residency at 1300 Linden Street, located on the kitchen shelf under the key ring holder.

27.     During the search of the front room of the residence the following items were recovered:

a.     Two (2) small pink plastic containers with cocaine base[4] within same located on the front windowsill next to the front door of the residence. The cocaine base weighed approximately 29.7 gross grams.

28.     During the search of the basement of the residence the following items were recovered:

a.     A green duffle bag containing several empty large and small clear plastic containers along with six (6) vacuum-sealed bags of suspected marijuana[5] located on top of a

---

[3] Your affiant was informed by Agents processing the residence that a presumptive test was conducted on the seized item which registered positive for crack/cocaine.

[4] Your affiant was informed by Agents processing the residence that a presumptive test was conducted on the seized item which registered positive for crack/cocaine.

13

red leather ottoman in the basement. The suspected marijuana weighed approximately six pounds.

29. Your affiant submits that based upon the location of purported marijuana, cocaine base, cocaine HCL, scales, packaging material, large amounts of USC, and multiple cellular telephones that ROSCOE was using the residence to facilitate the drug trafficking activities of himself and EVANS.

30. During a post-Miranda interview ROSCOE he admitted that police would have found marijuana in his residence.

31. Although ROSCOE is currently indicted on charges only relating to marijuana, your affiant submits there is probable cause to believe that ROSCOE has committed the SPECIFIED FEDERAL OFFENSES involving marijuana, cocaine base, and cocaine. ROSCOE's home, which is owned by his mother, had cocaine base and cocaine HCL both packaged and unpackaged for sale in various locations of the residence, including ROSCOE's room. Moreover, other evidence, such as a digital scale with white powdery residue on it and razor blades and packaging materials were also found in the residence. This paraphernalia is indicative of someone distributing narcotics. And, considering where the drugs were found and EVANS' involvement in cocaine and crack cocaine sales, your affiant believes there is probable cause that ROSCOE conspired, aided, and maintained that dwelling to further EVANS' cocaine operation.

**ii.    Title III intercepted communications involving ROSCOE**

32. On March 8, 2019, at 1944 hours under Session 600, EVANS contacted Antwyne

---

[5] These vacuum-sealed bags were not opened to conduct a presumptive test.

14

SHAMBURGER (hereinafter "SHAMBURGER"), a subdistributor of EVANS. The pertinent

portion of this conversation was as follows:

| | |
|---|---|
| SHAMBURGER: | Yo bro. |
| EVANS: | What you doing man? |
| SHAMBURGER: | Shit over river. |
| EVANS: | You telling him you talk to Ros [PH]. |
| SHAMBURGER: | Aha, yeah I talked to him earlier... did you talk her [PH] ? |
| EVANS: | No, no, I say he probably sleep. |
| SHAMBURGER: | You say, you was sleep? |
| EVANS: | I say, you probably sleep. |
| SHAMBURGER: | He, he back. |
| EVANS: | From where? |
| SHAMBURGER: | He went out and got the, got the shit. |
| EVANS: | Oh yeah? |
| SHAMBURGER: | Yeah. |
| EVANS: | Oh, oh, oh, oh, I didn't know, I'm ready to call and see what's going on. |

33.     During this conversation SHAMBURGER informed EVANS that "Ros" had

returned from an unknown location. Your affiant knows that ROSCOE is referred to by a

multitude of nicknames, one (1) being "Ros."[6] SHAMBURGER stated that ROSCOE "went out

and got the, got the shit." Your affiant submits that SHAMBURGER was talking about picking

up a quantity of controlled substances.

34.     On March 13, 2019, at 1308 hours under Session 766, EVANS contacted

SHAMBURGER. SHAMBURGER had previously informed EVANS on March 12, 2019, at

1907 hours under Session 733 that he finally got a new vehicle. The pertinent portion of this

conversation was as follows:

SHAMBURGER:     Hello?

---

[6] This was further corroborated following the execution of a search warrant on EVANS' main
cellular telephone. ROSCOE was saved in EVANS' contacts as "Ros," and photographs were
stored depicting the brothers under the same telephone number.

| EVANS: | Yo bro? |
| SHAMBURGER: | Yo. |
| EVANS: | What you doing? |
| SHAMBURGER: | On my way, about to come over to the west side. |
| EVANS: | A'ight, what you all wanted? The same thing? |
| SHAMBURGER: | Yeah, but, listen, bro, I had put, I was talking to Ros told me to put, he told me to put everything I had into the car, you feel me? like, and then ask bro to throw you something right quick, like. That's what I did. |
| EVANS: | What you do? |
| SHAMBURGER: | I put 30, like I said, I put 31 into the car, you know what I mean? |
| EVANS: | I got you, I got you, I got you. I got you. You hear me? |
| SHAMBURGER: | I am about to come over that way in a little bit. I am on my way over that way. |
| EVANS: | A'ight. |
| SHAMBURGER: | A'ight? I am call you as soon as am on west side, I am on my way now. |

35.     In your affiant's training and experience, during this phone call SHAMBURGER was discussing how ROSCOE authorized SHAMBURGER to utilize a sum of money to conduct the purchase of the vehicle. SHAMBURGER openly admitted to EVANS that he acted at the direction of ROSCOE when he stated, "I was talking to Ros told me to put, he told me to put everything I had into the car, you feel me?" SHAMBURGER explained this to EVANS because at the time, because of the vehicle purchase, he had no money to purchase crack cocaine from him. He indicated the ROSCOE told him that EVANS would front[7] him a quantity of controlled substances, "bro to throw you something right quick." EVANS did not refute this or tell him no, he simply agrees to meet him when he gets into the Hilltop area of the City.

---

[7] Your affiant knows the term fronting to mean giving an individual a quantity of drugs without upfront payment.

16

## CONCLUSION

36.    In your affiant's training and experience, your affiant knows it is common for individuals who engage in drug trafficking to utilize multiple cellular telephone devices, as well as to segregate their contacts with sources of supply or customers by device in order to maintain secrecy and to limit potential law enforcement detection.  In addition, your affiant knows that drug traffickers will often change phones in an effort to evade law enforcement. Still, when a drug trafficker changes phones, they will often keep their old phone at their residence.

37.    In your affiant's training and experience, you affiant knows that drug traffickers and their associates often communicate via encrypted applications, iMessages, and other forms of communication that are not typically intercepted by law enforcement through TIII wiretaps. In addition, drug traffickers and their associates also sometimes have seemingly innocent information that often constitutes evidence, including but not limited to photographs, videos, saved contacts, applications, financial records, and other evidence that establishes the extent of drug trafficking activities.  Your affiant submits that the instant TARGET DEVICES are also likely to have such information.

38.    There is probable cause to believe that ROSCOE violated SPECIFIED FEDERAL OFFENSES.  There is also probable cause to believe that ROSCOE has used the TARGET DEVICES to further the SPECIFIED FEDERAL OFFENSES.  Based upon your affiants training and experience narcotics traffickers carry multiple devices in order to communicate with sources of supply, co-conspirators and customers.

17

39. For all the reasons outlined above, your affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

James H. Reisch
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me
on April 26, 2019:

HONORABLE MARY PAT THYGNE
UNITED STATES MAGISTRATE JUDGE

18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE SEARCH OF:

Three Apple iPhones Seized From The Room
of Ryan Evans on March 25, 2019

CURRENTLY LOCATED AT:

Case No. _____

DEA Wilmington Resident Office
New Castle, Delaware 19720

## ATTACHMENT A

1.    The devices to be searched are:

    a.    an Apple iPhone 6S (hereinafter "TARGET DEVICE # 1") with a black front and silver backing with an IC#579C-E2944A and an FCC ID BCGE2944A;

    b.    an Apple iPhone X with a white front and rose gold backing (hereinafter "TARGET DEVICE # 2"); and

    c.    an APPLE IPHONE 6 with a black screen and a silver backing with IMEI#352014077823024 (hereinafter "TARGET DEVICE # 3").

The TARGET DEVICES are all currently located at the DEA Wilmington Regional Office, in New Castle, Delaware. The TARGET DEVICES were seized during a search warrant on March 25, 2019.

2.    This warrant authorizes the forensic examination of the TARGET DEVICES for the purpose of identifying the electronically stored information described in Attachment B.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE SEARCH OF:

Three Apple iPhones Seized From The Room
of Ryan Evans on March 25, 2019

CURRENTLY LOCATED AT:

Case No. _____

DEA Wilmington Resident Office
New Castle, Delaware 19720

## ATTACHMENT B

1.     All records on the TARGET DEVICES described in Attachment A that relate to violations of:

i.     Title 21, U.S.C. § 841(a)(1), which prohibits any person from knowingly or intentionally manufacturing, distributing, or dispensing, or possessing with the intent to manufacture, distribute, or dispense, a controlled substance.  The substances involved in this investigation include marijuana, crack cocaine, cocaine, and heroin.

ii.     Title 21 U.S.C. § 846, which prohibits any person from attempting or conspiring to commit violations of Title 21 of the United States Code.

iii.     Title 21 U.S.C. § 846, which prohibits any person from aiding or abetting others who commit violations of Title 21 of the United States Code; and

iv.     Title 21 U.S.C. § 856, which prohibits any person from maintaining a dwelling for the purposes of storing controlled substances.

since August 1, 2018, including:

a.  Any electronic calendars, notes, task lists, or other information relating to any person's whereabouts or activities relevant to violations of the "SPECIFIED FEDERAL OFFENSES";

b.  Images, pictures, photographs, videos, or other visual depictions sent or received by the TARGET DEVICES regardless of the underlying program used to create, store, send, or receive such depictions relating to violations of the "SPECIFIED FEDERAL OFFENSES";

c.  GPS data showing the location and movement of the TARGET DEVICES from August 1, 2018, to present;

d.  Bank records, checks, credit card bills, account information, and other financial records related to violations of the "SPECIFIED FEDERAL OFFENSES"; and

e.  The content of any and all text messages or instant messages sent or received by the TARGET DEVICES regardless of the underlying program used to send and receive those messages relating to violations of the "SPECIFIED FEDERAL OFFENSES."

2.  Evidence of user attribution showing who used or owned the TARGET DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, photographs, videos, documents, and browsing history, regardless of when the content/file was created.

3.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2